# EXHIBIT  A

V I R G I N I A:

IN THE CIRCUIT COURT FOR HENRICO COUNTY

| | |
|---|---|
| PENINSULA RADIOLOGICAL ASSOCIATES, LTD., <br><br>               Plaintiff, <br><br> v. <br><br> CHANGE HEALTHCARE INC.; CHANGE HEALTHCARE SOLUTIONS, LLC; CHANGE HEALTHCARE OPERATIONS, LLC; and CHANGE HEALTHCARE TECHNOLOGY ENABLED SERVICES, LLC, <br><br>     Serve: C T Corporation System, R/A <br>             4701 Cox Road, Suite 285 <br>             Glen Allen, Virginia, 23060 <br><br>             Defendant. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) )      Case No. CL25-1161 |

## **COMPLAINT**

Plaintiff Peninsula Radiological Associates, Ltd. ("PRA"), by counsel, states the following

in support of its claims against Defendants Change Healthcare Inc.; Change Healthcare Solutions,

LLC; Change Healthcare Operations, LLC; and Change Healthcare Technology Enabled Services,

LLC (collectively "Change Entities" or "Defendants"), which seek declaratory relief and monetary

damages arising from a breach of contract.

      1.      Change Healthcare Inc., through its subsidiaries, predecessors, and affiliates were

the successors in interest to a practice management agreement dated September 26, 2007 (the

"Agreement") with PRA, which provides radiology services. Under the Agreement, the Change

Entities were obligated to provide a significant number of services that included, *inter alia*,

processing PRA's patient charges, submitting timely claims for PRA's charges to insurance

companies and other payers, collecting payments, pursuing accounts receivable, overseeing the repayment of refunds, maintaining compliance with regulatory rules governing confidential patient information, and implementing appropriate safeguards to prevent the use or disclosure of patient health information and PRA's other confidential business information.

2.      In October 2022, the Change Entities were purchased by the healthcare giant, UnitedHealthcare Group ("UHG"), and the entities were "integrated operationally" into UHG's subsidiary, OptumInsight, Inc. ("Optum"). Shortly after the merger, the Change Entities underwent numerous procedural and staffing changes that negatively impacted the Change Entities' performance under the Agreement. Beginning around January 2023, the Change Entities breached their obligations when physician charges were no longer timely submitted, patient reimbursements started to plummet, and accounts receivable grew from lack of collection. In short, the Change Entities breached the most important services promised in the Agreement, which were billing and collecting revenue. The bulk of PRA's damages arise from that initial breach of contract.

3.      The Change Entities' contractual default was later exacerbated by a ransomware cyberattack in February 2024, during which all of the Change Entities' data systems and healthcare payment platforms were inaccessible, which resulted in the *complete cessation* of all claims billing and the improper use and disclosure of confidential patient health information and other confidential data belonging to PRA and its patients.

4.      Acknowledging the impact of the ransomware attack (but concealing the Change Entities' culpability for the same), the Change Entities offered a Temporary Funding Assistance Program to PRA and other providers (the "TFAP"), through Change Healthcare Operations, LLC, which was not a standalone, arm's length transaction. Rather, the extension of funds was expressly for the purpose of paying PRA funds "that you may have otherwise received" but for the disruption

2

in the Change Entities' provision of services. It was not clear until later that the TFAP had not been offered as a good faith attempt to provide access to funds that would later be collected, but instead, an attempt to unilaterally impose unfair and unreasonable terms on PRA to repay funds that PRA would have received but for the Change Entities' numerous defaults, including those related to the ransomware cyberattack.

     5.     Boiled down, the Change Entities knew (but concealed) that the ransomware attack was the predictable result of the Change Entities' own failure to institute reasonable safeguards to protect their platform (and PRA's confidential information), but due to an imbalance of knowledge in their favor, the Change Entities were able to take advantage of the financial crisis the cyberattack created to reclassify a portion of their debt as a short-term loan, which could be used later as a sword to steer anticipated litigation toward a more favorable venue.

     6.     By way of this action, PRA seeks a monetary judgment in the principal amount of $2,500,000 for the Change Entities' numerous breaches of contract, as compensation for the patient charges that were not properly processed, submitted, or collected, plus all other damages identified throughout this complaint, plus its costs and fees, net of any valid credits. PRA further requests that this Court declare that PRA is entitled to set off and retain the proceeds from the TFAP, that the purported terms of the TFAP, most notably its forum selection clause, are unenforceable, and that the Change Entities are barred from using the TFAP as a justification for instructing UHG to withhold payment for valid and unrelated insurance claims.

### PARTIES, JURISDICTION, AND VENUE

     7.     Plaintiff Peninsula Radiological Associates, Ltd. is a limited liability company with physicians working in offices located in Newport News, Hampton, Smithfield, Williamsburg,

Gloucester, and the Eastern Shore of Virginia. PRA was incorporated more than 50 years ago, and it is comprised of a team of board certified, fellowship trained radiologists.

8.      Change Healthcare Inc. is a Delaware corporation with its principal place of business in Nashville, Tennessee. It is a subsidiary of UnitedHealth Group Incorporated ("UHG"). Change Healthcare is now operated as part of UHG's subsidiary, OptumInsight, Inc., which is the entity that employed the individuals assigned to PRA's Agreement.

9.      Change Healthcare Solutions, LLC ("Change Solutions") is a Delaware limited liability company with its principal place of business in Nashville, Tennessee. Change Solutions is registered to do business in Virginia, and it is a subsidiary of Change Healthcare Inc.

10.     Change Healthcare Technology Enabled Services, LLC ("Change Technology") is a Georgia limited liability company with its principal place of business in Eden Prairie, Minnesota. It is registered to do business in Virginia. Change Technology is one of the contracting entities that expressly promised to provide practice management services. The precise affiliation between the Change Entities and Change Technology is unclear, but on the face of the contracts, Change Technology signed an amendment to the Agreement.

11.     Change Healthcare Operations, LLC ("Change Operations") is a Delaware limited liability company with its principal place of business in Nashville, Tennessee. Change Operations is a subsidiary of Change Healthcare, Inc. To acquire funds under the TFAP, providers like PRA were required to accept non-negotiable terms offered by Change Operations. Despite extending funds to PRA in Virginia, Change Operations has not registered to do business in Virginia.

12.     Though not direct parties to this action, both Optum and its parent, UHG, are healthcare services companies that are principally located in Minnesota. Both entities are registered to do business in Virginia, and both play a significant role in the oversight and control

4

of the Change Entities' operations. UHG operates an insurance company as well as a portfolio of healthcare service entities under the umbrella of its subsidiary Optum. Employees working with PRA, including those that attended PRA's board meetings, represented themselves as employees of Optum, though they were acting on behalf of the Change Entities to deliver services that were promised in the Agreement.

13.    On current information and belief, after the merger, the Change Entities operated as a single enterprise that act as alter egos of one another that lack separateness, operate as mere instrumentalities, fail to follow corporate formalities, utilize overlapping operations, jointly enter contracts, and commingle finances. By way of example, individuals providing services under the Agreement identified themselves, interchangeably, as working for Optum and Change Healthcare. Similarly, Change Operations extended funds under the TFAP to provide access to capital that other Change Entities should have collected for PRA. Change Operations did not have any independent business purpose for entering such an arrangement. Later, when the Change Entities demanded reimbursement, they informed PRA they would "start withholding payment on [UHG] claims," including third-party insurance claims that had never been administered by the Change Entities or otherwise affected by the cyberattack.

14.    Personal jurisdiction may be exercised over the Change Entities in the Commonwealth under Virginia Code § 8.01-328.1 because the Change Entities transact substantial business, supply things and services in the Commonwealth, and they collectively caused injuries in the Commonwealth through breach of contract.

15.    Venue in Henrico County is permissible under Virginia Code § 8.01-262 because there is a practical nexus between the claims and this venue, and Defendants all maintain a registered office in Henrico County, where an appointed agent is authorized to receive process.

5

## FACTUAL ALLEGATIONS

### *Change Healthcare's Contract with PRA*

16.     The Change Entities, through predecessor entities, contracted with PRA to be its sole provider of reimbursement management services. More specifically, on September 26, 2007, PRA entered a Practice Management Services Agreement (the "Agreement") with PST Services, Inc., a subsidiary of McKesson Information Solutions.

17.     In 2017, Change Healthcare Holdings, Inc. entered a joint venture with McKesson Corporation.[1] The new company was named Change Healthcare. As a result of the joint venture, the Change Entities became the successor-in-interest to PST Services, Inc.

18.     A true and accurate copy of the Agreement, along with its internal schedules, are attached here, collectively, as Exhibit A.

19.     On December 2, 2020, PRA and the Change Entities entered a written amendment to the Agreement (the "Amendment"), which was signed by Change Technology.

20.     A true and accurate copy of the Amendment is attached as Exhibit B.

21.     Under the Agreement, the Change Entities agreed to, among other things, timely submit electronic filing with third-party payers, major insurance carriers, Medicare and Medicaid, provide monthly management reporting, follow up on delinquent insurance accounts, collect accounts receivable, and notify PRA of unpaid accounts ("Services").    *See* Ex. A (Agreement, Schedule 1).

---

[1] The actual series of transactions may have been more complicated, but in the end, the Change Entities acquired and assumed the role of PST Services, Inc.  https://www.mckesson.com/about-mckesson/newsroom/press-releases/2017/mckesson-and-change-healthcare-complete-the-creation-of-new-healthcare-information-technology-company/#:~:text=Transaction%20Terms%20and%20Structure,by%20McKesson%20and%20CHC%20stockholder.

6

22.    Generally, payments for healthcare services proceed in the following fashion: charges for healthcare services are submitted as claims to health insurers, also known as "payers," who pay the medical claims submitted by providers like PRA.

23.    The process begins with a patient seeking care from a healthcare provider like PRA, who confirms insurance coverage (and often collects a co-pay). The healthcare provider then treats the patient. That was PRA's responsibility under the Agreement.

24.    After treatment, the healthcare provider or its practice manager submits a claim to a payer, so that the provider can be compensated for treating the patient. Prior to paying healthcare providers, the payer evaluates the submitted claim to determine how much, if any, it should pay the providers for the services rendered. The payer then sends the healthcare provider an electronic remittance advice, or ERA, which outlines the claim, and the allowable amounts to be paid or denied, before paying the provider the determined amount. The Change Entities were responsible for managing and overseeing the claim and reimbursement process.

25.    In addition to their billing obligations, the Change Entities further agreed that they would "comply with all requirements of the Health Insurance Portability and Accountability Act and its implementing regulations ("HIPAA")." The Change Entities were "required to comply with federal and state laws regarding the protection of [protected health information ("PHI")] as defined by HIPAA."

26.    Pursuant to the business associate agreement, appended to the Agreement as Schedule 5, the Change Entities are limited to disclosing PHI only "as necessary to provide the Services" under the main agreement and are required to "implement administrative, physical, and technical safeguards that reasonably and appropriately protect the confidentiality, integrity, and

7

availability of [electronic protected health information] created, received, maintained, or transmitted on behalf of" PRA.

27.    Additionally, the parties were authorized to terminate the Agreement on thirty (30) days' written notice "if the other party defaults on any of its obligations...and such party has not begin to cure such default."

28.    In the event of termination, which was later invoked by PRA, the Change Entities had a short work out period to pursue additional accounts receivable before providing "a final list of accounts receivable and all other documentation provided to or gathered by" them "for the provision of the Services."

### UnitedHealth Group Buys Change Healthcare

29.    In January 2021, UHG agreed to purchase Change Healthcare, Inc. and its affiliates, subsidiaries, and assigns for approximately $13 billion.[2]

30.    In October 2022, following a Department of Justice antitrust investigation and trial, the merger was ultimately approved, and UHG finalized its acquisition of Change Healthcare and integrated its operations under its existing umbrella organization, Optum.[3]

31.    In support of the merger, UHG and Change Healthcare claimed that the merger would result in significant benefits to the healthcare system, including simplifying and accelerating physician billing and patient payment processes, accelerating cash flow to providers, lowering

---

[2] *U.S. v. UnitedHealth Group Inc., and Change Healthcare Inc.*, 1:22-cv-481, Post-Trial Memorandum Opinion, Dkt. No. 138 at 9 (D.D.C. Sept. 21, 2022).
[3] *U.S. v. UnitedHealth Group Inc., and Change Healthcare Inc.*, 1:22-cv-481, Def.'s Proposed Findings of Fact and Conclusions of Law, Dkt. No. 121 at 11 and 18 (D.D.C. Sept. 7, 2022); James Farrell, *Change Healthcare Blames 'BlackCat' Group for Cyber Attack That Disrupted Pharmacies and Health Systems*, FORBES (Feb. 29, 2024, 1:18 PM),https://www.forbes.com/sites/jamesfarrell/2024/02/29/change-healthcare-blames-blackcat-group-for-cyber-attack-that-disrupted-pharmacies-and-health-systems/ (last visited Jan. 14, 2025); https://www.optum.com/en/about-us/news/page.hub5.optum-and-change-healthcare-complete-combination.html.

financial burdens, decreasing the frequency of denied claims, and "minimiz[ing] the amount of friction between payers and providers."[4]

32.    After completion of the merger, UHG "acquired all of the outstanding common shares of Change Healthcare" and, thus, wholly owns Change Healthcare.[5]

33.    After Change Healthcare integrated with Optum, employees from Optum started attending PRA's board meetings to discuss the Change Entities' performance under the Agreement, and it was unclear to PRA whether they were in business with the Change Entities or Optum.

### *Breach of Contract Following Change Healthcare's Acquisition*

34.    After the October 2022 merger and acquisition by UHG, the Change Entities started using a new platform, protocols, and staff to provide the electronic reimbursement services under the Agreement, and the Change Entities' performance started to precipitously decline.  PRA's accounts receivables' balance increased throughout 2023 beyond what would be acceptable in the industry, due to increased processing times and diminishing collection rates.

35.    The Change Entities' breach of the Agreement was not immediately apparent to PRA due to the ordinary lag time during which claims are submitted, verified, and collected. However, within a relatively short period of months, the Change Entities' poor performance under the Agreement became readily apparent to PRA, and it was the source of concern in discussions between the parties.

---

[4] *U.S. v. UnitedHealth Group Inc., and Change Healthcare Inc.*, 1:22-cv-481, Post-Trial Memorandum Opinion, Dkt. No. 138 at 9 (D.D.C. Sept. 21, 2022); and *U.S. v. UnitedHealth Group Inc., and Change Healthcare Inc.*, 1:22-cv-481, Def.'s Pretrial Brief, Dkt. No. 103 at 1 (D.D.C. July 22, 2022).
[5] *Change Healthcare Inc. & UnitedHealth Group Inc*, TAGNIFI, https://viewer.tagnifi.com/deals/TD0000030592 (last visited Jan. 14, 2025).

9

36.    Based on historic trends and performance standards in the industry, a healthcare practice's accounts receivable should roughly track the volume of its charges. That did not occur after the merger, as shown in the graph to the right.



37.    After the 2022 merger (shown with a black vertical line), the Change Entities' inefficient billing practices and poor collection rate caused PRA's accounts receivable (green line) to begin to diverge sharply from PRA's total charges (blue line).

38.    The Change Entities' failure to timely process, efficiently bill, and later collect on claims resulted in a substantial growth in unpaid accounts receivable, even though there was not a corresponding increase in the volume of charges.[6]

39.    On or about November 8, 2023, representatives for the Change Entities (identifying themselves as employees of Optum) participated in a meeting of PRA's board of directors. At the meeting, the group discussed the unacceptable growth of the accounts receivables, and the Change / Optum representative stated there had been "changes in workflows" that had "resulted in follow up delays." The concessions are recorded within meeting minutes drafted by Defendants.

40.    On December 13, 2023, at the next board of directors' meeting, the group again discussed Defendants' declining performance, and the Change / Optum representatives admitted

---

[6] This was a major problem. The exact dollar values on the Y-axis of the graph have been omitted to protect PRA's sensitive commercial information. However, the graph is measured in millions of dollars, and increase in uncollected charges directly resulted in significant damages, as reflected in the Prayer for Relief seeking $2,500,000.

that they needed to dedicate additional resources "to targeted follow up of accounts in the older [accounts receivable]." The representatives stated optimistically that, "[i]ncreased collections are anticipated to begin in January as a result."

41.     At the same meeting, PRA asked the Change / Optum representatives to reimburse PRA for shortfalls in the collections required under the Agreement. The representative "agreed that Optum is responsible for ensuring the catch up and that he would review the shortfall projection."

42.     However, despite Optum's promises, the Change Entities' performance with respect to reimbursement management services saw only a short-term bump in performance, and the Change Entities continued to breach their obligations under the Agreement to timely process, bill, and collect charges. The Change Entities also failed to cure their default by ensuring a catch up of collections or reimbursing PRA for its shortfall, as promised at the meeting.

43.     Because of Defendants' default, and in an attempt to mitigate their losses, PRA started to research new healthcare payment software and systems—as well as vendors—that might be needed to remedy the increasing disparity in billed charges and collected claims.

### The Change Entities' Payment Platform Collapses

44.     While PRA was investing time and expenses in researching alternate systems and vendors, the Change Entities' poor cyber security protocols led to a complete shutdown of its payment platform and online network due to a cyberattack, adding to its significant defaults under the Agreement and causing additional losses for PRA.

45.     In February 2024, the Change Entities' data systems and healthcare payment platform were compromised in a ransomware attack. The Change Entities had no viable backup plans or systems in place to combat a predictable crisis. In a largely futile effort to prevent further

collapse of its systems, Change Healthcare elected to take the remaining systems—including their healthcare payment platform—offline completely.

46.    On February 21, 2024, in an SEC filing, UHG announced that "a suspected nation-state associated cyber security threat actor had gained access to some of the Change Healthcare information technology systems."[7]

47.    The ransomware attack could and should have been prevented if only the Change Entities had "implement[ed] appropriate safeguards," as promised in the Agreement, and that additional breach caused Defendants' already poor collection rate to plummet to practically zero, as shown in the graph on the next page, which was compiled and provided to PRA by representatives for Change / Optum:



48.    Following more than a year of already significant collection shortfalls, the cyber-attack on the Change Entities' payment processing platform was the final straw, and PRA acted quickly to mitigate additional losses to the extent possible.

49.    On March 7, 2024, PRA sent a notice of termination of the Agreement to the Change Entities, through their Optum representatives, as permitted in the Agreement, which allowed for termination after an event of default.

---

[7] *UnitedHealth Group Incorporation Form 8-K*, SEC (Feb. 21, 2024),
https://www.sec.gov/Archives/edgar/data/731766/000073176624000045/unh-20240221.htm (last accessed Jan. 14, 2025).

50.     While Change Healthcare's payment platform was shut down, the Change Entities were unable to disclose claims reimbursement information to the new healthcare reimbursement service provider for months.  During this time, despite having engaged a new vendor, PRA was unable to verify patient eligibility and coverage, file claims, appeal denials or partial denials of claims, receive electronic health remittances (ERAs), bill patients, earn reimbursements, or receive payments from insurers for patient care that preceded the ransomware attack. This continued for months, when PRA received little, if any, reimbursement from insurers for patient visits.

### *The Change Entities Offer the TFAP as Part of a Scheme to Impose Unfair Terms*

51.     The complete shutdown caused by the cyberattack was the direct and proximate result of the Change Entities' own errors and omissions, but the lack of access to revenue put PRA and other providers in a vulnerable position because their ordinary operating expenses were not placed on hold.  Wages, rent, and other expenses still had to be paid.

52.     On March 10, 2024, the Change Entities offered a Temporary Funding Assistance Program (the "TFAP") to PRA to supply funds "*that you may have otherwise received*" but for the disruption in the Change Entities' platform.  Stated more accurately, the Change Entities offered PRA a short-term loan to obtain access to funds that the Change Entities should have collected and paid under the Agreement.

53.     A copy of the purported terms governing the TFAP is attached here as <u>Exhibit C</u> (the "Purported TFAP Terms").

54.     On information and belief, the only reason the Change Entities offered the TFAP was to take advantage of PRA and other similar providers.  More specifically, the Change Entities represented that the TFAP was being offered as a good faith lifeline for their customers to access funds that would later be collected.  However, in reality, the Change Entities were concealing their

13

own role and knowledge about the cause, nature, and breadth of the ransomware attack, so they could loan funds—*that were unlikely to ever be collected*—and take advantage of an unequal bargaining position to impose unfair and unreasonable terms, most importantly, a forum selection clause that would consolidate likely nationwide litigation in a favorable venue.

55.    The Change Entities enjoyed an unequal bargaining position because they knew that the ransomware attack could have been prevented, that it was unlikely to be resolved quickly, and that the lack of access to claims would result in a high percentage of the claims never being collected. Meanwhile, PRA was misled to believe that access to the platform would be restored quickly, and that most, if not all, of the impacted claims would still be collected. That disparity of knowledge gave the Change Entities an opportunity to offer only a fraction of the damages owed to PRA for their breach of contract, and if PRA refused to re-pay the purported loans down the road, then the Change Entities could attempt to use the Purported TFAP Terms as a basis to initiate litigation in their preferred forum in Minnesota.

56.    Before the TFAP, PRA had no prior relationship or direct contact with Change Operations. It is now apparent that the only reason the TFAP was offered by Change Operations— rather than Change Technology, Change Solutions, or Optum—was because Change Operations had less business activity in other states, and that entity was not as easily linked to the other Change Entities' earlier defaults. But, Change Operations was not acting independently, but rather as an agent for the other Change Entities, as tacitly recognized on the face of the Purported TFAP Terms, which concede that use of "the words 'Change Healthcare', 'Change', 'CHC', 'We', 'Us', or 'our' means Change Healthcare Operations, LLC, its *parents, affiliates, successors, and assigns*."

57.    The TFAP was supposedly being offered as a stopgap for providers to compensate them for uncollected charges, and inherent in the extension of funds as a loan was the promise that

14

the Change Entities would eventually collect PRA's unpaid claims, *but that never happened*. A majority of those claims remained unpaid. Regardless, the Change Entities are still trying to utilize the TFAP as a sword to demand reimbursement for funds that were only lost because of the Change Entities' own defaults. There is no basis for reimbursing the TFAP, regardless of whether Change Operations has largely complied with the Purported TFAP Terms.

### *The Change Entities Inflate Their Collections and Withhold Insurance Proceeds*

58.    In April 2024, the Change Entities finally regained access to their online system and payment platform, and due to the termination of the Agreement, the Change Entities started their workout period to collect old claims. While doing so, the Change Entities misrepresented the volume of PRA's accounts receivable that were being collected, which on information and belief, allowed the Change Entities to charge and retain unearned fees.

59.    Despite multiple requests, the Change Entities have never provided data verifying the alleged collections, nor have they reconciled the alleged collections with specific patient claims. The deposits into PRA's accounts do not support the Change Entities' claims, and it appears that the Change Entities collected unearned fees for unfulfilled services.

60.    Adding insult to injury, on February 3, 2025, the Change Entities informed PRA that they would "start withholding payment on UnitedHeathcare claims" the following week if PRA did not immediately repay the funds advanced under the TFAP. The UHG insurance proceeds that are being withheld have no relationship to the historic claims impacted by the cyberattack (*i.e.*, the claims that allegedly prompted the extension of the TFAP), and those third-party withholdings are just another example of the Change Entities' bad faith, the lack of true separation between the various entities, and their plain intent to weaponize the TFAP.

15

61.    As a direct and proximate result of the Change Entities' numerous breaches of the Agreement, including, but not limited to, their untimely and improper collection practices, their failure to institute safeguards to prevent the ransomware attack, the failure to protect and keep PHI and other confidential information from misuse, their concealment of facts related to the causes and breadth of the cyberattack, their attempt to use an unfair bargaining position to unilaterally impose unfair contract terms, including a forum selection clause, their misrepresentation and inflation of accounts receivable collections during the workout period, and their attempt to withhold unrelated insurance proceeds, PRA has suffered real and concrete damages for unpaid collections, improper fees, lost revenue, cover costs, and lost productivity of at least $2,500,000.

### COUNT I
### BREACH OF CONTRACT

62.    PRA re-alleges and incorporates by reference Paragraphs 1–61 of this Complaint, as if fully set forth herein.

63.    Defendants, collectively, acting together as a single enterprise, entered into a valid and enforceable contract with PRA, as shown in the Agreement and Amendment.  The Change Entities never provided an assignment agreement that plainly identified which entity had legally acquired the PST Services / McKesson interest in the Agreement, nor did they act as separate entities throughout their performance.

64.    Under the Agreement, Defendants contracted with PRA to provide the Services.

65.    Defendants materially breached the Agreement with PRA by failing to perform the contracted-for Services. Specifically, Defendants failed to collect payments for PRA's healthcare services, failed to implement appropriate safeguards for the protection of PHI, failed to collect adequate accounts receivable, failed to accurately report the claims that were collected, withheld information about the scope and breadth of the ransomware attack, attempted to reclassify their

16

debts as loan obligations, and failed to give prompt notice to PRA that its healthcare platform would be taken offline, which together directly and adversely affected PRA who was no longer able to receive the Services it paid for, or its ordinary revenues derived from its charges.

66.    As a direct and proximate result of Defendants' breaches, PRA has been injured and is entitled to damages in an amount to be proven at trial. PRA's damages include one or more of the following: (a) missed payments for their healthcare services; (b) delayed payments for their healthcare services; (c) the costs of securing financing alternatives to those missed or delayed payments; (d) interest charges incurred; (e) additional labor costs; (f) expenses associated with and time spent hiring staff or vendors to troubleshoot the business disruption caused by Defendants' breaches; (g) expenses associated with and time spent researching and implementing new healthcare payment software and systems; (h) expenses associated with and time spent attempting to circumvent the shutdown and obtain payments that otherwise were to be processed through the Change Healthcare payment platform; (i) late penalties, if any, assessed by payers and lost income from denials arising from untimely submission of claims and charges; (j) lost benefit of its bargains and overcharges for the Services; and (k) loss of the time-value of money, including, but not limited to, interest or other income, associated with the preceding injuries and damages.

## COUNT II
### UNJUST ENRICHMENT
(IN THE ALTERNATIVE)

67.    PRA re-alleges and incorporates by reference Paragraphs 1–67 of this Complaint, as if fully set forth herein.

68.    In the alternative, if an express agreement is not found to be enforceable between PRA and any of the named Defendants, then PRA is entitled to an award for those entities' unjust enrichment.

69.    PRA conferred a benefit on all named Defendants by paying for their Services, providing access to their network of information, and allowing the Change Entities to collect fees from revenue earned from PRA's charges.

70.    Defendants knew that PRA conferred benefits, which Defendants willingly accepted with the understanding that those benefits were conferred in exchange for the full and proper performance of their duties. Defendants profited from these transactions and appreciated the benefits.

71.    It would be unjust for Defendants to retain these benefits when, as noted above, Defendants failed to timely bill and collect charges and other revenue required under the Agreement, and they failed to provide reasonable security, safeguards, and protections to the confidential information of PRA and its patients' PHI.

72.    PRA has suffered damages and harm because of Defendants' negligence, breaches of contract, and unlawful conduct, inactions, and omissions. Defendants should be required to disgorge all unlawful or inequitable benefits received from PRA.

## COUNT III
### DECLARATORY JUDGMENT

73.    PRA re-alleges and incorporates by reference Paragraphs 1–72 of this Complaint, as if fully set forth herein.

74.    Under Virginia Code § 8.01-184, *et seq.*, this Court is empowered to resolve active disputes, interpret disputed contract terms, and make binding adjudications of right.

75.    Three actual controversies exist here.

76.    First, an actual controversy exists as to whether PRA is entitled to retain the proceeds of the TFAP that were provided in the wake of the Change Entities' numerous breaches of contract noted above. Those funds were extended for the express purpose of providing PRA

18

with access to funds that should have been collected by the Change Entities, but for their default under the Agreement. As such, permitting set off would be reasonable, and it would maintain the status quo, while the full measure of the Change Entities' default is determined.

77.    Second, the Purported TFAP Terms and its forum selection clause attempt to compel litigation with Change Operations—though not the other Defendants—in Minnesota, but the forum select clause should be deemed invalid and unenforceable for several reasons.

78.    PRA's causes of action are not based on an alleged breach of the TFAP, but rather on Defendant's breach of the Agreement, as amended. The only issue that relates to the TFAP is whether PRA should be entitled to set off its damages by retaining the proceeds from the TFAP, but that transaction is not the basis for PRA's primary cause of action for breach of contract. As such, a forum selection clause in the TFAP should not control the venue of PRA's claims.

79.    The Purported TFAP Terms were not subject to negotiation, as the terms were presented as a take-it-or-leave-it agreement to be signed online. The Purported TFAP Terms was not provided to an authorized representative of PRA in a format that was editable or subject to redline. Instead, the Change Entities, by and through Change Operations, unilaterally published the Purported TFAP Terms without input or negotiation, thus rendering them an adhesion contract.

80.    The forum selection clause is unfair, unreasonable, unconscionable, and affected by both fraud and unequal bargaining power. The Change Entities offered the TFAP while concealing their own culpability for the attack, as well as the unlikelihood that the impacted claims would ever be collected. By doing so, the Change Entities were able to "re-paper" a portion of the payment obligations arising from a breach of contract into a purported loan agreement, which was only possible because of the unequal bargaining power arising from a concealment of information, coupled with the precarious financial position that their own misconduct had created.

19

81.    Additionally, it would be wasteful to compel parallel litigation between PRA and Change Operations in Minnesota relating to the proceeds of the TFAP, while PRA proceeded with its primary claims in Virginia, which concern the other Defendants' breach of the Agreement.

82.    Third, while PRA acknowledges that it seeks confirmation of its right to set off and retain proceeds from the TFAP, those funds have a reasonable relationship to the Change Entities' breach of the Agreement, as the stated basis for the TFAP was to provide access to revenue that should have been collected under the Agreement.  However, a party's right to set off should only be available for valid and equitable debts, and it would be unfair, unjust, and against public policy to allow the Change Entities to use the unenforceable and unconscionable TFAP as a basis to instruct UHG to withhold insurance proceeds that are rightfully owed for independent claims.

83.    As a result, PRA seeks declarations and further relief as follows: (1) that PRA is entitled to set off and retain the proceeds of the TFAP paid by Change Healthcare Operations, LLC, to offset the damages incurred due to the Change Entities' collective default under the Agreement, which include the failure to institute reasonable safeguards for their payment platform; (2) that the Purported TFAP Terms and its forum selection clause are unconscionable, unenforceable, unfair, and the product of fraud and unequal bargaining power; and (3) that the Change Entities are barred from using the TFAP as a basis for instructing or requesting that UHG withhold payment of valid third-party insurance claims.

## **REQUEST FOR RELIEF**

WHEREFORE, Plaintiff PRA respectfully prays that this Honorable Court:

(1) Enter judgment in favor of Peninsula Radiological Associates, Ltd on Count I (or in the alternative Count II) and against all named Defendants Change Healthcare Inc.; Change Healthcare Solutions, LLC; Change Healthcare Operations, LLC; and Change

20

Healthcare Technology Enabled Services, LLC, jointly and severally, in the principal amount of $2,500,000, or a similar sum determined at trial, net of any valid credits, plus interest from the date of breach until paid in full;

(2) Enter an Order declaring under Virginia Code § 8.01-184, *et seq.*, and providing further relief under § 8.01-186, as follows:

    a.  That PRA is entitled to set off and retain the proceeds of the TFAP paid by Change Healthcare Operations, LLC, to offset the damages incurred due to the Change Entities' collective default under the Agreement;

    b.  That the Purported TFAP Terms and the forum selection clause therein are unconscionable, invalid, unfair, unenforceable, and the product of fraud and unequal bargaining power; and

    c.  That the Change Entities may not rightly instruct and are barred from having UHG withhold payment on unrelated third-party insurance claims.

(3) Award any other relief the Court deems just and appropriate.

## JURY DEMAND

PRA demands trial by jury on all issues so triable.

Dated: February 10, 2025

Respectfully submitted,

PENINSULA RADIOLOGICAL ASSOCIATES, LTD

By Counsel

Virginia M. Bruner (VSB No. 81913)
Justin S. Feinman (VSB No. 87511)
William J. Homer (VSB No. 99988)

21

WILLIAMS MULLEN, P.C.
200 South 10th Street, 16th Floor
Richmond, Virginia 23219
Telephone: 804.420.6000
Facsimile:  804.420.6507
vbruner@williamsmullen.com
jfeinman@williamsmullen.com
whomer@williamsmullen.com

PRACTICE MANAGEMENT SERVICES AGREEMENT

THIS AGREEMENT (this "Agreement") is made and entered into by and between PST Services, Inc. a McKesson company, a Georgia corporation ("Per-Se"), and Peninsula Radiological Associates, Ltd., a corporation organized under the laws of the Commonwealth of Virginia ("Client"), as of September 26, 2007 (the "Effective Date").

In consideration of the covenants and agreements contained herein, Client and Per-Se agree as follows:

1.       **Services.** Beginning on the Commencement Date (as defined below), Per-Se will perform the physician practice management services set forth on Schedule 1 to this Agreement (the "Services") on behalf of Client. Client shall, on a timely basis and in a format reasonably acceptable to Per-Se, provide the information set forth on Schedule 1 necessary for Per-Se to perform such Services in an efficient manner (the "Client Responsibilities"). During the term of this Agreement, Per-Se will be the sole provider to Client of all of the Services identified as "Reimbursement Management Services" on Schedule 1 to this Agreement. In performing the Services hereunder, Client acknowledges that Per-Se shall at all times be acting as an independent contractor.

2.       **Term.** The initial term of this Agreement will be two (2) years (the "Initial Term") beginning October 1, 2007 (the "Commencement Date"). This Agreement will automatically renew for additional one (1) year terms unless (i) either party delivers to the other written notice of termination at least ninety (90) days prior to the expiration of the then-current term, or (ii) as otherwise set forth in Section 11 of this Agreement.

3.       **Monthly Fees.** Beginning as of the Commencement Date, Client agrees to pay Per-Se the monthly fee set forth on Schedule 2 to this Agreement (the "Monthly Fee"), which will be billable on the first (1st) day of each month.

4.       **Bank Account.** A bank account will be maintained in the name of Client at a bank designated by Client. All cash receipts will be deposited into the bank account. Per-Se will have no ownership rights in the bank account and will have no right to negotiate or assert ownership of checks made payable to Client. Client will be responsible for all fees associated with such bank account. Client reserves the right to modify or revoke such arrangements at any time.

5.       **Confidentiality.** Per-Se agrees not to disclose, and to cause its employees, agents and representatives not to disclose, to anyone other than Client the terms of this Agreement, Client's business practices or other trade secrets or confidential information of Client or any information about any of Client's patients received in the course of performing the Services, except as required to bill charges or as otherwise legally required. Client agrees that Per-Se may use Client information for data aggregation and/or research and statistical compilation purposes so long as Client and patient identifying information is kept confidential in accordance with applicable law. Client acknowledges that the software employed by Per-Se in performing the Services (the "Software") is confidential and that Per-Se is the sole owner or licensee of the Software, all report formats and all reports generated by the Software that are produced for internal operational purposes and not generally made available to Client. Client agrees not to disclose and to cause its employees, agents and representatives not to disclose to anyone, other than its attorneys, provided Client has caused such attorneys to be bound by the confidentiality terms set forth herein, the terms of this Agreement, the Software, or any information it receives about the Software, Per-Se's business practices or other trade secrets or confidential information of Per-Se, except as legally required. Each party agrees that the other party does not have an adequate remedy at law to protect its rights under this Section and agrees that the non-defaulting party will have the right to seek injunctive relief from any violation or threatened violation of this Section.

6.       **Regulatory Restrictions.** Each party warrants that it is not currently listed by a Federal agency as excluded, debarred, or otherwise ineligible for participation in any Federal health care program. Each party agrees that it will not employ, contract with, or otherwise use the services of any individual whom it knows or should have known, after reasonable inquiry, (a) has been convicted of a criminal offense related to health care (unless the individual has been reinstated to participation in Medicare and all other Federal health care programs after being excluded because of the conviction), or (b) is currently listed by a Federal agency as excluded, debarred, or otherwise ineligible for participation in any Federal health care program and further agrees that it will immediately notify the other in the event that it, or any person in its employ, has been excluded, debarred, or has otherwise become ineligible for participation in any Federal health care program. Each party agrees to continue to make reasonable inquiry regarding the status of its employees and independent contractors on a regular basis by reviewing the General Services Administration's List of Parties Excluded from Federal Programs and the HHS/OIG List of Excluded Individuals/Entities.

7.       **Compliance Programs.**

7.1      Per-Se agrees to maintain a billing regulatory compliance program in material conformance with the Office of Inspector General's Compliance Guidance for Third-Party Medical Billing Companies.

7.2      Per-Se agrees that it will comply with all requirements of the Health Insurance Portability and Accountability Act and its implementing regulations ("HIPAA") applicable to Per-Se.

7.3      Per-Se and Client agree to abide by the terms and conditions of the "Business Associate Agreement" attached hereto as Schedule 5.

EXHIBIT

tabbies®

A

8.    **Operating Procedures.**  The parties acknowledge that they have been parties to an agreement for the same or similar services as are to be rendered pursuant to this Agreement prior to the Commencement Date.  Client agrees to provide or cause others to provide to Per-Se accurate and complete insurance and demographic information as required by Per-Se to perform the Services.  In the event that Per-Se assigns the procedure and diagnostic codes, Client agrees to provide the necessary clinical information required by Per-Se to perform such coding as described on Schedule 1(I).  In the event that Client is assigning the procedure and diagnostic codes pursuant to Schedule 1(II), Client shall be responsible for the accuracy, validity and appropriateness of such codes. Per-Se agrees to perform the Services in accordance with industry practices in Client's specialty and geographic area and all applicable laws, rules and regulations, including applicable third-party payer policies and procedures.  Client acknowledges that Per-Se has every incentive to perform the Services in a timely and proficient manner but that the timing and amount of collections generated by the Services are subject to numerous variables beyond the control of Per-Se, including, without limitation, (a) the inability of third parties or systems beyond the control of Per-Se to accurately process data, (b) the transmission to Per-Se of inaccurate, incomplete or duplicate data, (c) untimely reimbursements or payer bankruptcies, (d) late charge documentation submissions by Client, and/or (e) managed care contract disputes between payers and Client.  Therefore, Per-Se makes no warranties or representations pertaining to the timing and amount of collections generated by the Services.  Client acknowledges and agrees that Client is solely responsible for providing the funds necessary to refund any overpayments.  As provided on Schedule 1, Part (I), Per-Se will be responsible for processing the refunds for any overpayments and processing any unclaimed property payments, provided that Client provides the funds to allow Per-Se to make such refunds and/or unclaimed property payments.  Client agrees to hold Per-Se harmless from and against any losses (including fines or penalties and interest) incurred by Per-Se as a result of Client's failure to make funds available to make such refunds and/or unclaimed property payments, provided that Per-Se has performed its refund and unclaimed property responsibilities as set forth on Schedule 1, Part (I).

9.    **Audits.**  During the term of this Agreement, Client will have the right to engage, at its expense, independent, external, third-party auditors (the "Third-Party Auditors") for the purpose of performing audits that may be considered necessary by Client to determine the accuracy and correctness of the accounting and internal control performed and maintained by Per-Se.  If Client engages Third-Party Auditors, who perform, or are associated with a group who performs, billing and accounts receivable management services substantially similar to any of the Services identified as "Reimbursement Management Services" on Schedule 1 to this Agreement, such Third-Party Auditors may not visit Per-Se's processing facility or audit the actual billing and collection process.  Per-Se will cooperate by furnishing such Third-Party Auditors with any and all information as is reasonably necessary to perform and complete all audit procedures.  Prior to performing such audits, Client will cause the Third-Party Auditors to execute Per-Se's "Confidentiality" Agreement.  Client agrees that any such audit will be conducted at such times and in such a manner so as to avoid undue disruption of Per-Se's operations.

10.    **Non-Employment.**  During the term of this Agreement and for a period of twelve (12) months following the termination of this Agreement, each party agrees not to employ, contract with for services, solicit for employment on its own behalf or on behalf of any third party, or have ownership in any entity which employs or solicits for employment, any individual who (i) was an employee of the other or its parent, affiliates or subsidiaries at any time during the preceding twelve (12) months and (ii) was materially involved in the provision of the Services hereunder without the prior written consent of the other party.  Notwithstanding the foregoing, upon any termination of this Agreement, Client may rehire any individual who was employed by Client on the Effective Date, and who was hired by Per-Se on or after such date.  Each party agrees that the other party does not have an adequate remedy at law to protect its rights under this Section and agrees that the non-defaulting party will have the right to injunctive relief from any violation or threatened violation of this Section.

11.    **Termination.**  Notwithstanding the provisions of Section 2:

11.1    Either party may terminate this Agreement on thirty (30) days' written notice of termination to the other if the other party defaults on any of its obligations under this Agreement (other than Client's payment obligations) and such party has not begun to cure such default within ten (10) days, and materially cured such default within thirty (30) days, after written notice of such default is delivered; provided that either party may terminate this Agreement immediately upon the occurrence of the third (3rd) default of the same obligation of the other party that occurs within a rolling twelve (12) month period  or

11.2    To the extent permitted by applicable law, either party may terminate this Agreement on ten (10) days' written notice of termination to the other if (a) a court having appropriate jurisdiction enters a decree or order for relief in respect of the other party in an involuntary case under any applicable bankruptcy, insolvency or other similar law now or hereafter in effect; or (b) the other party commences a voluntary case under any applicable bankruptcy, insolvency or other similar law now or hereafter in effect; or

11.3    Per-Se may terminate this Agreement immediately if Client defaults on its payment obligations under Section 3 and Schedule 2  and such payment default is not cured within ten (10) days after Per-Se delivers written notice of such default to Client; or

11.4    If Per-Se contracts for the use of third-party software to be used in the provision of the Services, Client agrees to execute any additional nondisclosure or proprietary material documentation that may be reasonably required by Per-Se or any such third-party software licensor.  If Client is unwilling to sign such additional documentation, Per-Se may terminate this Agreement on the tenth (10th) business day after presenting such documentation if Client fails to complete such documentation during such time;  or

11.5    Client may terminate this Agreement immediately if Per-Se fails to cure any material breach of the "Business Associate Agreement" set forth on Schedule 5 to this Agreement within thirty (30) days of written notice from Client specifying the breach; or

11.6    The parties acknowledge and agree that, in consideration of Client's executing this Agreement with an Initial Term of two (2) years and one (1)-year annual renewal terms thereafter, Per-Se has provided a fee reduction to Client, such fee reduction to include a (i) reduction in the percentage of Net Collections fee, beginning with the invoice for September, 2007, and (ii) credit on the September and October, 2007 invoices, as set forth on Schedule 2. The parties also acknowledge and agree that Client currently performs its services at Riverside Regional Medical Center ("RRMC") locations. If RRMC causes Client to perform its services at RRMC locations as part of the Riverside Medical Group, LLC ("RMG"), Client will use its best efforts to cause RMG to assume all rights and obligations of Client under this Agreement and to cause RMG to continue to use Per-Se as the billing agent for RMG's radiology accounts receivable pursuant to all the terms and conditions set forth in this Agreement. If, despite the best efforts of Client, RMG does not assume all rights and obligations of Client under this Agreement and continue to use Per-Se as the billing agent for RMG's radiology accounts receivable, Client may terminate this Agreement on ninety (90) days' written notice to Per-Se provided that Client pays Per-Se an early termination fee (the "Early Termination Fee"). The parties agree that the Early Termination Fee is an amount equal to three thousand five hundred dollars ($3,500.00) multiplied by the number of months remaining in the then-current term of the Agreement. The parties understand and acknowledge that the Early Termination Fee is intended as a liquidated damages provision and not a penalty. The Early Termination Fee is in addition to any other legal remedy Per-Se may have against Client, if any, and is in no way intended to limit the rights and remedies Per-Se may have against Client arising out of any breach of this Agreement.

12.    **Termination Procedures.** In the event this Agreement is terminated or expires, Client hereby requests, and Per-Se agrees, that Per-Se will return to Client, pursuant to the procedures set forth below, all materials provided to or gathered by Per-Se for the provision of the Services hereunder. Client shall choose either the option set forth in Section 12.1 or the option set forth in Section 12.2 as a means of transferring its accounts receivable from Per-Se to another provider of billing services (unless this Agreement is terminated by Per-Se pursuant to Section 11.3, in which case only the procedures set forth in Section 12.2 will apply):

12.1    Upon the effective date of termination/expiration, Per-Se shall cease to enter new patient and charge data into its computer system ("Computer System") on behalf of Client, but will (i) continue to perform the Services identified as "Reimbursement Management Services" on Schedule 1 to this Agreement, at the then-current rates hereunder, for a period of ninety (90) days with respect to all of Client's accounts receivable arising from charges rendered prior to the termination date (the "Workout Period"), (ii) thereafter discontinue processing such accounts receivable, (iii) deliver to Client, after full payment of all fees owed, a final list of accounts receivable and all other documentation provided to or gathered by Per-Se for the provision of the Services, (iv) provide reasonable transitional services, as set forth on Schedule 4 to this Agreement, and (v) have no further obligations to Client. The parties agree that all applicable terms and conditions of this Agreement will be in full force and effect until the end of the Workout Period; or

12.2    (a)    For Client's accounts receivable for which Per-Se receives a Monthly Fee based on a percentage of the Net Collections, on or before the effective date of termination/expiration, Client shall pay Per-Se a one-time fee for the Services provided by Per-Se during the immediately preceding months equal to the amount listed on Schedule 2 to this Agreement (the "Services Rendered Fee"). Upon the effective date of termination/expiration, Per-Se shall (i) be immediately relieved of the obligation to provide any further Services on behalf of Client, (ii) deliver to Client, after full payment of all fees owed, including but not limited to the Services Rendered Fee, a final list of accounts receivable and all other documentation provided to or gathered by Per-Se for the provision of the Services, (iii) provide reasonable transitional services, as set forth on Schedule 4 to this Agreement, and (iv) have no further obligations to Client. Notwithstanding the foregoing, if Client terminates the Agreement pursuant to the terms set forth in Section 11.1, Client will not have to pay Per-Se the Services Rendered Fee. The Services Rendered Fee is in no way intended to limit the rights and remedies Per-Se may have against Client arising out of any breach of this Agreement; and/or

(b)    For Client's accounts receivable for which Per-Se receives a Monthly Fee based on a set dollar amount, upon the effective date of termination/expiration, Per-Se shall (i) be immediately relieved of the obligation to provide any further Services on behalf of Client, (ii) deliver to Client, after full payment of all fees owed, a final list of accounts receivable and all other documentation provided to or gathered by Per-Se for the provision of the Services, (iii) provide reasonable transitional services, as set forth on Schedule 4 to this Agreement, and (iv) have no further obligations to Client.

13.    **Limitation of Liability; Claims Period.**

13.1    Per-Se shall have no liability for the (a) inability of third parties or systems beyond the control of Per-Se to accurately process data, or (b) transmission to Per-Se of inaccurate, incomplete or duplicate data. In all other circumstances, it is expressly understood and agreed that each party's liability for all loss or damage incurred by the other party, arising from any cause whatsoever under this Agreement, to the extent that such loss or damage is caused by the other party, shall be limited to the sum of the Monthly Fees paid by Client to Per-Se during the term of this Agreement; provided, however, that each party's aggregate liability under this Agreement shall not exceed the Monthly Fees paid by Client to Per-Se during the term of this Agreement ("Limitation of Liability"). No proceeding or action arising out of this Agreement may be brought by either party more than twenty-four (24) months after the cause of action has arisen ("Claims Period").

13.2    Notwithstanding the foregoing, the Limitation of Liability and Claims Period set forth above shall not apply to any civil monetary fine or penalty and interest (but not overpayments) assessed against either party by Medicare, Medicaid or other third-party health insurance provider arising out of the sole negligence or willful misconduct of the other party in the performance of its obligations hereunder. As provided in Section 8 and on Schedule 1 of the Agreement, the obligation to fund the repayment of overpayments received by Client is the sole responsibility of Client, and Per-Se is responsible for notifying Client about the overpayments, processing them and paying them with funds supplied by Client.

13.3    Neither party shall in any event be liable to the other for any indirect, special, incidental, consequential or similar losses or damages suffered by such party or any third party, even if such party has been advised of the possibility of such damages.

13.4    The limitations set forth above reflect a deliberate and bargained for allocation of risks between Per-Se and Client and constitute the basis of the parties' bargain, without which Per-Se and Client would not have agreed to the terms and conditions of this Agreement.

14.    **Notice.** Any notice, payment, demand or communication required or permitted to be given by the provisions of this Agreement will be effective on the date of receipt if sent or delivered by certified/return receipt mail or by national overnight delivery service to PST Services, Inc., 1145 Sanctuary Parkway, Suite 200, Alpharetta, Georgia 30004, Attention: President, if to Per-Se; and Peninsula Radiological Associates, Ltd., 3630 George Washington Memorial Highway, Suite E, Yorktown, Virginia 23693, Attention: John C. Daimler, M.D., President, if to Client, or at such other address(es) or to the attention of such other persons as the parties may from time to time designate in writing by notice as set forth above.

15.    **Force Majeure.** Neither party shall be liable for any failure or delay in performing its obligations under this Agreement due in whole or in material part to any cause beyond its sole control, including but not limited to fire, accident, labor dispute or unrest, flood, riot, war, rebellion, insurrection, sabotage, terrorism, transportation delays, shortage of raw materials, energy or machinery, acts of God or of the civil or military authorities of a state or nation, or the inability, due to the aforementioned causes, to obtain necessary labor or facilities.

16.    **Waiver.** The failure of either party to enforce any term or condition of this Agreement shall not be construed as a waiver by such party of such term or condition, nor shall a waiver of any breach of a term or condition of this Agreement on any one occasion constitute a waiver of any subsequent breach of the same or similar term or condition.

17.    **Assignment.** Neither party may assign this Agreement without the prior written consent of the other, which consent shall not be unreasonably withheld; provided, however, that each party hereby consents to any assignment to any successor of the other due to acquisition, merger, consolidation or reorganization, provided that any such assignment shall not alter the terms of the Agreement without the written consent of the non-assigning party; and each party further agrees to cause any successor of such party due to acquisition, merger, consolidation or reorganization to agree to the assignment of this Agreement to such successor, provided that any such assignment shall not alter the terms of the Agreement without the written consent of the non-assigning party.

18.    **Miscellaneous.** This Agreement contains the entire agreement of the parties relative to the Services to be provided to Client and no representations, warranties, inducements, promises or agreements, oral or otherwise, between the parties not embodied in this Agreement will be of any force or effect. This Agreement specifically supersedes any prior written or oral agreements, understandings, negotiations and proposals between the parties relating to the provision of the Services. The section headings used herein are for convenience only and shall not be used in the interpretation of this Agreement. If any provision of this Agreement is determined to be invalid or unenforceable, such provision shall be deemed severable from the remainder of this Agreement and shall not cause the invalidity or unenforceability of the remainder of this Agreement. This Agreement has been mutually negotiated by the parties and/or the parties' counsel and shall be interpreted in accordance with its terms without favor to either party. Nothing expressed or implied in this Agreement is intended, or shall be construed, to confer upon or give any person, firm or corporation other than the parties hereto, and their successors or assigns, any rights, remedies, obligations or liabilities under or by reason of this Agreement, or result in such person, firm or corporation being deemed a third party beneficiary of this Agreement. Any changes to this Agreement will be made by a written Amendment (the "Amendment") to the Agreement and will not be effective until such Amendment is executed by authorized representatives of both parties. Per-Se and Client represent and warrant that they have the full power and authority to enter into this Agreement and that the person executing this Agreement has the full power and authority to do so.

PENINSULA RADIOLOGICAL ASSOCIATES, LTD.                    PST SERVICES, INC.

By: _John C. Daimler M.D._                    By: _Patrick J. Leonard_

Print Name: _J. C. DAIMLER_                    Print Name: _PATRICK J. LEONARD_

Title: _President_                    Title: _Vice President: General Mgr_

Date: _10/1/07_                    Date: _3/05/08_

SCHEDULE 1

SCOPE OF SERVICES

I.   **Per-Se Reimbursement Management Services:**
   (a)   Enter demographic information and coding information onto the Per-Se Computer System.
   (b)   Handle all accounts in accordance with all applicable laws.
   (c)   Bill managed care accounts in accordance with the terms of Client's executed contracts. If no contract exists, bill such accounts in accordance with the rules of the state in which care was provided or, if no state rules apply, in accordance with Per-Se's normal business procedures.
   (d)   Receive copies of the patient's charts, check for completeness, maintain a daily log of charts received.
   (e)   Provide electronic transfer of demographic data from hospital, where available (may require physician involvement).
   (f)   Code each patient chart, on the basis of the information provided by Client, including ICD-9 and CPT codes, procedural modifiers and HCPCS Level II regulatory modifiers.
   (g)   Provide electronic filing with Medicare, Medicaid and Blue Shield, and other third-party payers, where applicable.
   (h)   Provide electronic filing with all major insurance carriers, where applicable.
   (i)   Provide electronic remittance from Medicare and all other carriers, where applicable.
   (j)   Mail patient statements and notices.
   (k)   Provide a toll-free "800" phone number to answer phone inquiries concerning patient account information.
   (l)   Respond to inquiries received by mail from patients and/or third-party payers.
   (m)   Receive all payment and reimbursement notices from Client's bank lockbox and post payments to the appropriate patient account.
   (n)   Provide statements in Client's name.
   (o)   File primary, secondary and tertiary insurance for patients and resubmit rejections and no action accounts.
   (p)   Back-up data off Computer System every night and store back-up tapes off-site.
   (q)   Provide monthly management reporting.
   (r)   Follow up on delinquent insurance accounts.
   (s)   Maintain Computer System with Computer System generated operational reports.
   (t)   Notify Client of accounts that remain unpaid. If Client requests Per-Se to forward its unpaid billings to a collection agency or law firm ("Collection Agent"), Per-Se will transmit the information required by the Collection Agent chosen by Client either by hard copy or electronically, in a mutually acceptable format, as requested by such Collection Agent, pursuant to instructions provided to Per-Se by Client.
   (u)   Notify Client of the Monthly Refund Amount owed by Client for the previous month. Upon Client's deposit of the Monthly Refund Amount in the Refund Account, prepare, sign and release the applicable individual patient and carrier refund checks.
   (v)   Provide on-site training at Client location (schedule and frequency to be mutually agreed upon).
   (w)   Provide annual impact analysis of Medicare reductions and/or participation evaluation and recommendation.
   (x)   Notify Client of any amounts that constitute Client's unclaimed property. Prepare Client's annual unclaimed property return for Client's review, execution and release.

II.   **Per-Se Comprehensive Management Services:**

   A.   **Physician Credentialing Services**
      (1)   Provide physician enrollment (and re-enrollment) for third-party payer contracts provided that Client provides the necessary information and secures the necessary signatures on completed enrollment forms in a timely manner.
      (2)   Maintain a database of all physician provider numbers.
      (3)   Maintain corporate meeting minutes and related documents.

   B.   **Accounting/Payroll Services**
      (1)   Establish accounting system based on MGMA chart of accounts
      (2)   Reconcile bank accounts to computer reports
      (3)   Maintain all books of account
      (4)   Prepare financial statements and balance sheets with comparatives
      (5)   Account for employee/physician fringe benefits
      (6)   Prepare operating and capital budgets
      (7)   Perform cash flow projections
      (8)   Coordinate outside audits, reviews of Client
      (9)   Process accounts payable
      (10)   Process payroll, and prepare W-2, 1099 and 941
      (11)   Prepare supporting schedules that outside accountants will need to prepare the annual corporate tax return.

   C.   **Financial Management Services**
      (1)   Assist in coordinating non-clinical Client business affairs
      (2)   Coordinate outside legal, accounting, and banking services on Client's behalf

      (3)    Assist in the design and administration of benefit programs, including pension plans, staff salary and bonus programs; sick paid time off, and vacation benefits; group health, medical reimbursement and cafeteria plans; disability and salary continuation plans; business expense reimbursement; continuing education allowance

      (4)    Perform annual insurance reviews, and solicit bids from brokers

      (5)    Provide current knowledge of governmental regulations, third-party payer activities, competition, economic changes, and other outside influences affecting Client

      (6)    Advise on internal/external cost reduction strategies in order to increase Client profitability

      (7)    Perform statistical and financial analysis

      (8)    Assist in financial planning

      (9)    Advise on cash flow management

      (10)   Perform staffing analyses and compare to benchmark data

      (11)   Recommend and design appropriate financial and internal controls

      (12)   Develop policies and procedures for effective asset and credit management, including working capital policies and management.

**D.**    **Compliance Services**

      (1)    Conduct coding and other reviews for purposes of compliance with payer billing requirements.

      (2)    Provide physician education on billing, coding and documentation, if necessary.

      (3)    Utilize technology-based compliance monitoring to internally evaluate practice billing risks by comparing practice billing to billing by peers within the same specialty.

      (4)    Conduct regular reviews of charge ticket/Superbill for accuracy and lost revenue opportunities.

**III.**    **Client Responsibilities:**

    (a)    On a timely basis and in a mutually acceptable format, provide the information necessary for Per-Se to perform the Services in an efficient manner. Such information should include:

      (1)    patient's name, sex, date of birth, status (single, married, other)

      (2)    responsible party's name, address, telephone number, employer

      (3)    insured's name (if different from patient), sex, date of birth, address, relationship to patient, insured's employer (if group policy), insured's employer's address

      (4)    name of insurance company, address, policy certificate number, group policy number

      (5)    copy of radiology report

      (6)    all applicable charge documents

      (7)    copy of release of information and insurance assignment of benefits, upon request by Per-Se

      (8)    HMO/PPO authorization numbers approvals (if applicable)

      (9)    copy of paid at time of service receipt (if applicable)

      (10)   date of service, chief complaint, medical history and exam, treatment, final diagnosis and physicians' notes.

    (b)    Furnish and/or cause to be transmitted and mailed to Per-Se, no less than every other business day and within three (3) business days of service, a complete batch of those charge tickets for each patient for whom Per-Se provides the Services. If medical records are missing and/or inaccurate or incomplete, they will be identified by Per-Se and Client and/or hospital staff will locate the missing records and/or obtain the incomplete and/or inaccurate data.

    (c)    Work with Per-Se to establish electronic transmission of patients' demographic and financial information.

    (d)    Provide access to one (1) or more members of Client's staff to answer questions regarding claims.

    (e)    Notify Per-Se of patients who qualify for free or reduced charge services due to financial hardship.

    (f)    Send copies of workers' compensation notification of compensable injury forms.

    (g)    Provide Per-Se with Client's fee schedule for entry onto Per-Se's Computer System prior to the Commencement Date of this Agreement. Per-Se will continue to update such fee schedule upon written notification to Per-Se of any change to such fee schedule by Client.

    (h)    Facilitate Hospital's report distribution of unallocated and/or unidentified funds or receipts, if applicable.

    (i)    Provide Per-Se with an electronic file, if available, of Client's referring physicians, including unique, identifying codes, UPIN and license numbers as of the Effective Date of this Agreement. Provide Per-Se with electronic updates, if available, to this file, containing similar required data, on a minimum monthly basis.

    (j)    Provide Per-Se with copies of contracted agreements with managed care plans, including the negotiated fee schedules.

    (k)    If Client requests Per-Se to forward its unpaid billings to a Collection Agent, Client shall: (1) provide Per-Se with written notice of the name and address of the Collection Agent chosen by Client (any contract for the provision of collection services for Client's unpaid billings shall be between Client and the Collection Agent chosen by Client); (2) provide Per-Se with written instructions on which unpaid billings shall be forwarded to such Collection Agent; and (3) if applicable, provide Per-Se with written authorization to execute documents presented to Per-Se and considered necessary for the collection of Client's unpaid billings by such Collection Agent on Client's behalf in accordance with the written instructions of Client. Client acknowledges and agrees that Client is solely responsible for the unpaid billings placed with such Collection Agent and further agrees to hold Per-Se harmless from and against any fines or penalties incurred as a result of the placement of such unpaid billings with such Collection Agent.

    (l)    Maintain and fund a separate bank account for refunds due by Client to individual patients and/or carriers (the "Refund Account"). Fund such Refund Account each month in an amount equal to the total refund payments due by Client to individual patients and/or carriers (the "Monthly Refund Amount") within ten (10) days of Client's receipt of notification from Per-Se of such Monthly Refund Amount owed by Client. Client further authorizes Per-Se, upon Client's deposit of

the Monthly Refund Amount in the Refund Account, to prepare, sign and release the applicable individual patient and carrier refund checks.

(m) If Client contracts with a physician not under the employ of Client to provide services for Client, and such physician cannot reassign its benefits to Client, Client will notify Per-Se prior to such physician beginning to provide services for Client. If Per-Se is to provide the Services for such physician, Client agrees that such physician must enter into an agreement for the performance of the Services with Per-Se with respect to such physician's accounts receivable.

(n) Review, execute and release Client's annual unclaimed property return upon receipt from Per-Se.

(o) Cause all payment and reimbursement notices received by Client to be sent to Per-Se on a daily basis so that Per-Se may timely post payments to the appropriate patient account.

(p) Provide names, detailed summary information and copies of applicable licenses for new physicians for initiation of payer enrollment by Per-Se, secure the necessary signatures on completed enrollment forms in a timely manner and coordinate the timely return of completed and signed physician enrollment applications and electronic claim submission authorization forms for all physicians.

## SCHEDULE 2

### SERVICE FEES

A.      Beginning as of the Commencement Date, Client agrees to pay Per-Se the Monthly Fee, billable on the first (1ˢᵗ) day of each month, as set forth below:

(i)     an amount equal to eight and one-half percent (8.5%) of the Net Collections made by or through Per-Se on Client's accounts receivable during the previous month for Per-Se's provision of the Reimbursement Management Services; and

(ii)    an amount equal to four thousand dollars ($4,000.00) per month for Per-Se's provision of the Comprehensive Management Services; and

(iii)   Per-Se will credit Client an amount equal to nineteen thousand two hundred thirty-four dollars and eighty-six cents ($19,234.86), such amount to be credited to Client in two (2) equal monthly installments of nine thousand six hundred seventeen dollars and forty-three cents ($9,617.43) on each invoice sent to Client under this Agreement for September and October, 2007.

Net Collections means the total sum of all monies collected by or through Per-Se for all clinical services rendered by Client, less amounts refunded or credited to a patient or third party payer as a result of overpayments, erroneous payments or bad checks. When unpaid billings are referred to a Collection Agent, the amount of Net Collections will include the net amount received by Client through the efforts of the Collection Agent after deducting the Collection Agent fee. The selection of a Collection Agent is the responsibility of Client, and Client agrees to pay directly any Collection Agent commissions and/or fees and costs.

Client represents that it is not entitled to bill globally and/or for the technical component and instructs Per-Se to bill only for the professional component of Client's accounts receivable.

B.      Invoicing, Payment and Fee Change.  Beginning as of the Commencement Date, Client agrees to pay the Monthly Fee and all other charges set forth in the Agreement within thirty (30) days of its receipt of each invoice from Per-Se.  Late payments by Client will result in a late payment charge equal to the lesser of one and one-half percent (1.5%) per month or the maximum monthly rate allowed by applicable law.  Client agrees to reimburse Per-Se for all costs and expenses, including reasonable attorneys' fees, incurred by Per-Se in enforcing collection of any monies due to it under this Agreement.  In addition to the foregoing and without waiver of its rights under Section 11.3 of the Agreement, Per-Se may suspend the performance of the Services hereunder during any period in which invoices are past due without incurring any liability to Client.

Either party may request a change in the Monthly Fee in the event of a material change in legislation, Client's business or other market conditions which results in a material change in either the cost associated with Per-Se's provision of the Services or Per-Se's anticipated revenues under this Agreement.  Per-Se may request a change in the Monthly Fee in the event any of the information provided by Client to Per-Se upon which the assumptions set forth on Schedule 3 to this Agreement are based is or becomes inaccurate.  In the event either party requests a change in the Monthly Fee, the requesting party will provide the non-requesting party with ninety (90) days' prior written notice (the "Notice Period") of the requested change (the "Notice") and such fee change will be effective at the end of the Notice Period.  If the non-requesting party provides the requesting party written notice during any such Notice Period that any such fee change request is unacceptable to the non-requesting party, the Agreement will terminate at the end of the Notice Period and the Monthly Fee in place at that time will remain in effect until the end of the Workout Period, if any.

C.      Additional Fees:

1.      Postage:  In addition to the Monthly Fee, Client will remit to Per-Se postage charges related to the provision of the Services during the previous month.  Client also agrees to pay an amount equal to the increased cost of postage paid by Per-Se in connection with the performance of the Services arising out of any increase in the U.S. Postal Service rates after the Effective Date.

2.      Services Rendered Fee:  In the event of termination of this Agreement, for any reason, and the option set forth in Section 12.2 is the procedure for transferring Client's accounts receivable to another entity pursuant to such termination, for Client's accounts receivable for which Client pays Per-Se a Monthly Fee based on a percentage of the Net Collections, the Services Rendered Fee shall be equal to one and one-half (1.5) times the average monthly invoice for the six (6) months immediately preceding the effective date of such termination.  No Services Rendered Fee shall apply for Client's accounts receivable for which Client pays Per-Se a Monthly Fee based on a set dollar amount per transaction.

## SCHEDULE 3

### PRACTICE ASSUMPTIONS

The following assumptions are based on information Client has provided to Per-Se. Based on these assumptions, Per-Se has determined the collectability of Client's accounts receivable and has derived the schedule of Monthly Fees set forth in Schedule 2 of the Agreement.

| | | |
|---|---|---|
| 1. | Average gross charges per month: | $2,740,631.00 |
| 2. | Unbillable and contractual allowances: | $1,66,686.00 |
| 3. | Bad debt: | $234,541.00 (8.5%) |
| 4. | Payer mix: | |
| | Self Pay | 8.4% |
| | Medicare | 42.2% |
| | Medicaid | 5.9% |
| | Commercial | 4.4% |
| | PPO | 2.6% |
| | Managed Care/HMO | 33.5% |
| | Other, Misc. | 3.0% |
| | Total | 100.0% |
| 5. | Average Net Collections per month: | $907,176.00 |
| 6. | Average number of procedures per month: | 25,039 |

SCHEDULE 4

TRANSITION SPECIFICS

Upon termination or expiration of this Agreement for any reason, Per-Se agrees to provide the following assistance to Client or Client's designated agent:

*FORMAT*
- ASCII Format with delimiters identified

*MEDIA*
- direct electronic transfer or CD

*FILE LAYOUT*
- All fields identified with field length, optional field and description

*FILE CODES* - Include printed lists of file codes for the following fields, if applicable:
- Insurance company codes
- Procedure codes
- Diagnosis codes
- Referral physician codes
- Place of service codes
- Type of service codes
- Payment, adjustment and transfer codes
- Pay class codes
- Bill type codes
- Patient type codes
- Employer codes
- Marital status codes
- Relationship codes
- Location codes
- Physician codes

**DIALOGUE**
- Programming contact to review files and to answer general questions

**TESTING**
A sample tape/CD with 100 patients to include:
- Demographics
- Insurance
- Charges
- Payments

FINAL TAPE - A final data tape(s)/CD with all patient accounts remaining on Per-Se's Computer System to include:
- Demographics
- Insurance
- Charges
- Payments

## SCHEDULE 5

### BUSINESS ASSOCIATE AGREEMENT

Per-Se will receive from Client protected health information ("PHI"), including electronic PHI ("ePHI"), as defined in the privacy and security regulations promulgated under the Health Insurance Portability and Accountability Act of 1996 (respectively hereinafter referred to as either the "HIPAA Privacy Rule" or the "HIPAA Security Rule") to perform certain practice management services ("Services") for Client under the terms of a services agreement with such Client (the "Agreement"), Therefore, the parties agree to the terms and conditions of this Business Associate Agreement (the "Business Associate Agreement") as follows:

A.      PHI shall be safeguarded as follows:

        (a)      **Disclosure.** Per-Se will not use and/or disclose PHI except (1) as necessary to provide the Services described in the Agreement; (2) as otherwise permitted or required by this Business Associate Agreement or as required by law; (3) for the proper management and administration of its business; and (4) to de-identify information and perform data aggregation as defined by the HIPAA Privacy Rule. Information that has been de-identified and the results of data aggregation performed by Per-Se together with any compilations, abstracts, summaries, studies or other information derived from such de-identified information or data aggregation shall be the sole and exclusive property of Per-Se. Client shall not be entitled to any revenue, royalties, or other compensation resulting from de-identified information and the results of data aggregation performed by Per-Se or any data or information derived from such de-identified information or data aggregation.

        (b)      **Safeguards.** Per-Se agrees to implement appropriate safeguards to prevent the use or disclosure of PHI, except as required to perform the Services, or as otherwise required by this Business Associate Agreement or as required by law. Also, Per-Se will implement administrative, physical, and technical safeguards that reasonably and appropriately protect the confidentiality, integrity, and availability of ePHI created, received, maintained, or transmitted on behalf of Client.

        (c)      **Reporting.** Per-Se will report to Client any use or disclosure of PHI of which it becomes aware that is not provided for in the Business Associate Agreement or that is in violation of the HIPAA Privacy Rule and any applicable laws, rules or regulations, by Per-Se, its directors, officers, employees, contractors or agents. In addition, Per-Se will report to Client any Security Incident of which it becomes aware. For purposes of this Business Associate Agreement, the term "Security Incident" shall mean the unauthorized access, use, disclosure, modification, or destruction of information or interference with system operations in an electronic information system storing or transmitting ePHI that is maintained by Per-Se.

        (d)      **Agents.** Per-Se will require its agents, including subcontractors, to whom Per-Se provides PHI pursuant to the Agreement, to agree to the same restrictions and conditions of this Business Associate Agreement concerning PHI, to implement reasonable and appropriate safeguards to protect ePHI, and to report to Client any Security Incident of which it becomes aware.

        (e)      **Access.** If applicable, upon Client's written request and within a reasonable time, Per-Se will provide Client access to PHI in a Designated Record Set. If an individual requests access to his/her PHI directly from Per-Se, Per-Se will forward such request to Client, and Client will instruct Per-Se in writing to disclose the PHI to the individual to meet the requirements under 45 CFR §164.524. Any disclosure of, or decision not to disclose, the PHI will be the sole responsibility of Client.

        (f)      **Amendment.** If applicable, upon Client's written request and within a reasonable time, Per-Se will make PHI in a Designated Record Set relating to a patient available to Client for amendment and incorporate any amendments or corrections to PHI pursuant to 45 CFR §164.526.

        (g)      **Accounting.** Upon Client's written request and within a reasonable time, if Client requests an accounting of disclosures of PHI regarding an individual made during the six (6) years prior to such request, but shall not include any disclosures that were made prior to the final compliance date of the Privacy Standards, Per-Se will make available to Client such information in Per-Se's possession at that time to make the accounting required by 45 C.F.R. §164.528, and Per-Se agrees to implement an appropriate record-keeping process to comply with the accounting and documentation of disclosure requirements under 45 CFR § 164.528.

        (h)      **Audit of Internal Practices.** Per-Se agrees to make its internal practices, books and records relating to the use and disclosure of PHI received from, or created or received by Per-Se on behalf of Client available to the Secretary of the Department of Health and Human Services to determine Client's compliance with the HIPAA Privacy Rule.

        (i)      **Termination.** If Per-Se fails to cure any material breach of this Business Associate Agreement, within thirty (30) days of receipt of written notice from Client specifying default by Per-Se, Client may terminate this Business Associate Agreement and the Agreement immediately. Upon termination of this Business Associate Agreement and the Agreement for any reason, if feasible, all PHI still maintained by Per-Se shall be returned to Client or destroyed by Per-Se. If return or destruction of PHI is not feasible, the protections of this Business Associate Agreement shall extend to any PHI retained by Per-Se, and Per-Se agrees to limit further uses and disclosures of such PHI to purposes and activities, such as financial or legal auditing or reporting, where Per-Se has a need or duty to use or disclose the PHI, and for other purposes and activities, such as maintenance or use of systems or databases.

B.      **Client Obligations.** Client agrees to obtain any consent or authorization that may be required by the HIPAA Privacy Rule or any other applicable law and/or regulation prior to furnishing Per-Se with PHI. Client also agrees to inform Per-Se of any PHI that is subject to any arrangements permitted or required of Client under the HIPAA Privacy Rule that may materially impact in any manner the use and/or disclosure of PHI by Per-Se under this Business Associate Amendment, including, but not limited to, restrictions on the use and/or disclosure of PHI as

provided for in 45 C.F.R. § 164.522 and agreed to by Client. Client shall not request Per-Se to make any use or disclosure of PHI that would not be permitted under the HIPAA Privacy Rule if made by Client directly.

C.      **No Third Party Beneficiaries.** Nothing expressed or implied in this Business Associate Agreement is intended, or shall be construed, to confer upon or give any person, firm or corporation other than the parties hereto, and their successors or assigns, any rights, remedies, obligations or liabilities under or by reason of this Agreement, or result in such person, firm or corporation being deemed a third party beneficiary of this Agreement.

D.      The terms of the HIPAA Privacy Rule, the HIPAA Security Rule and all terms of this Business Associate Agreement (including all amendments) pertaining to the use and disclosure of PHI and ePHI shall be effective as of the compliance date(s) of the HIPAA Privacy Rule and the HIPAA Security Rule. If there are revisions to either the HIPAA Privacy Rule or the HIPAA Security Rule, the parties agree to negotiate in good faith to incorporate such revisions in this Business Associate Agreement.

E.      In the event of inconsistency between the provisions of this Business Associate Agreement and mandatory provisions of either the HIPAA Privacy Rule or the HIPAA Security Rule, as amended, or their interpretation by any court or regulatory agency with authority over either party hereto, the HIPAA Privacy Rule or the HIPAA Security Rule, as interpreted by such court or agency, shall control. Where the provisions of this Business Associate Agreement are different from those mandated in either the HIPAA Privacy Rule or the HIPAA Security Rule, but are nonetheless permitted by such rules as interpreted by courts or agencies, the provisions of this Business Associate Agreement shall control.

## AMENDMENT I

This amendment (the "Amendment") amends that certain Practice Management Services Agreement (the "Agreement"), effective September 26, 2007, between Peninsula Radiological Associates, Ltd., a Virginia corporation ("Client") and PST Services, Inc. (a McKesson company), a Georgia corporation ("McKesson").

For good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

1. Schedule 2. C. Additional Fees. 1. Postage. The Agreement is amended by deleting Section 1. Postage from Section C of such Schedule in its entirety as of the Effective Date of the Agreement.

2. Capitalized terms used herein and not otherwise defined have the same meaning as in the Agreement. In the event any term or condition of this Amendment is inconsistent with any term or condition of the Agreement, the terms of this Amendment will control. Except as stated above, all terms of the Agreement shall remain in full force and effect.

IN WITNESS WHEREOF, the parties have executed this Amendment on the dates set forth below.

**PENINSULA RADIOLOGICAL ASSOCIATES, LTD.**

By: _Jolin C Daimle MD_

Print Name: _J. C. DAIMLER_

Title: _President PRA_

Date: _Oct 3, 2007_

**PST SERVICES, INC.**

By: _Patk f Leon_

Print Name: _Patrick J. Leonard_

Title: _Vice President & General MGR._

Date: _3/25/08_



Peninsula Radiological Associates, Ltd.
Amendment No: P2021 10042166
December 2, 2020

## Amendment

This Amendment ("Amendment") to the contract(s) listed in the Amended Agreements table ("Agreement") is between Change Healthcare Technology Enabled Services, LLC, successor-in-interest to PST Services, Inc. ("Service Provider") and Peninsula Radiological Associates, Ltd. ("Client"). This Amendment is effective as of the latest date in the signature block below ("Amendment Effective Date").

### Amended Agreements

| Contract No./Name: | Effective Date: |
|---|---|
| Practice Management Services Agreement | September 26, 2007 |

### Purpose

The purpose of the Amendment is to modify the Term, Scope of Services and Service Fees of the Agreement. The parties agree to the following terms.

### Terms

1. <u>Section 2, Term</u>. Notwithstanding anything to the contrary contained in this Section, the parties acknowledge and agree that the Agreement is renewed for a period of three (3) years from January 1, 2021. Thereafter the Agreement will renew in accordance with the terms originally set forth in the Agreement.

2. <u>Schedule 2, Services Fees</u>. Effective January 1, 2021, item A. (I) in such Section of the Agreement is deleted in its entirety and replaced with the following:

   an amount equal to 6.5% of the Net Collections made by or through Service Provider on Client's accounts receivable during the previous month for Service Provider's provision of the Reimbursement Management Services; and

3. <u>Schedule 2, Services Fees, Section C. 1, Postage</u>. Effective January 1, 2021, item C. (1) Postage is deleted in its entirety and replaced with the following below.

   1. Service Provider is responsible for postage charges related to the provision of the Services during the Agreement.

4. <u>Schedule 1, Scope of Services, Service Provider Reimbursement Management Services</u>. The parties acknowledge and agree that Effective January 1, 2021, responsibility (u) of such Section of the Agreement, is hereby deleted in its entirety and replaced with the following:

   u. Service Provider will notify Client in writing of the Monthly Refund Amount owed by Client for the previous month. Upon Client's deposit of the Monthly Refund Amount in the Refund Account, prepare, sign and release the applicable individual patient and carrier refund checks.

5. <u>Schedule 1, Scope of Services, Client Responsibilities</u>. The parties acknowledge and agree that as of the Amendment Effective Date, responsibility (l) of such Section of the Agreement, is hereby deleted in its entirety and replaced with the following:

   l. Fund a bank account, maintained by Service Provider, for refunds due by Client to individual patients and/or carriers (the "Refund Account"). Fund such Refund Account each month in an amount equal to the total refund payments due by Client



EXHIBIT
B

Peninsula Radiological Associates, Ltd.
Amendment No: P202110042166
December 2, 2020

to individual patients and/or carriers (the "Monthly Refund Amount") within thirty (30) business days of Client's receipt of notification from Service Provider of such Monthly Refund Amount owed by Client.  Client further authorizes Service Provider, upon Client's deposit of the Monthly Refund Amount in the Refund Account, to prepare, sign and release the applicable individual patient and carrier refund checks. However, if Client has not funded the Refund Account so that the posted balance exceeds the total refund amount by thirty (30) business days after notification by Service Provider, Client must prepare, sign, and release the refund check(s) on its own behalf despite Client having selected this option.

6.  Capitalized terms not defined in this Amendment are defined in the Agreement. All terms in the Agreement not modified by this Amendment are still in force. This Amendment contains all the terms agreed upon by the parties regarding the subject matter of this Amendment and supersedes any other communications relating to the subject matter of this Amendment.

**Change Healthcare Technology Enabled Services, LLC**

By: _____

Name: _____

Title: _____

Date: _____

**Peninsula Radiological Associates, Ltd.**

By: _____

Name: _____Steven  M.  Irby_____

Title: _____President , PRA_____

Date: _____12/3/2020_____



Peninsula Radiological Associates, Ltd.
Amendment No: P2021 10042166
December 2, 2020

## STATEMENT OF WORK
## SMARTPAY

The MRA Terms and Conditions and this Service Schedule apply to all services rendered by CHC under this Service Schedule.

### 1. Scope of Deployment.

1.1. Customer selects the following solution modules, as further defined below or in supporting Materials, as part of the SmartPay Services:

☒ **Patient Pay Online Portal**      ☐ **Merchant Services**

☒ **eCashering Portal**      ☐ **Payment API**

☒ **Consumer Phone Pay ("IVR")**      ☐ **Consumer Lockbox**

### 2. Additional Service Offering Requirements.

2.1 **Consumer Payment Lockbox Service.** Customer authorizes CHC to receive, process, and distribute documents that are received by CHC via the Consumer Payment Lockbox Service.

    a. **Statement Format.** This service will utilize a CHC-approved remittance coupon format as a part of its outgoing statements.

    b. **Failed Payments.** CHC will notify Customer of any payment transactions CHC is unable to process and will forward to Customer any non-payment correspondence received by CHC.

    c. **Image Retention.** CHC will maintain images of all mail pieces it receives on behalf of Customer for a period of ten (10) years from the date of upload.

    d. **Wind-Down Period.** For a period of six months following the termination of the Consumer Payment Lockbox Service for any reason ("Wind-down Period"), CHC will continue to collect any mail received for Customer at CHC's payment lockbox. At Customer's sole expense, CHC will remit to Customer or its designee all mail received during the Wind-down Period in a manner mutually agreed upon by the parties. After the Wind-down Period, CHC will return all mail to its sender as "Lockbox Closed."

### 2.2 Merchant Processing Services.

    **2.2.1**    Customer will provide merchant processing services and any associated banking relationships needed to support such services to facilitate the processing of electronic payments from Customer's patients and other Customers ("Merchant Services"). CHC will utilize a Customer defined and provided third party merchant payment systems.

        i.    Customer will provide to CHC a Value-added Reseller ("VAR") sheet, or similar documentation, outlining the configuration requirements for their selected Merchant Service and provide support and coordination, in the event needed, to assist CHC with administering the Merchant Service.

Peninsula Radiological Associates, Ltd.
Amendment No: P202110042166
December 2, 2020

ii. All funds processed and collected through Customer's Merchant Services will be routed and deposited to Customer's banks as defined by Customer with their designated Merchant Service.

**2.2.2** In the event that Customer requests CHC to provide and manage a payment processing gateway, CHC will provide a selected third-party merchant services provider, and its sponsor bank (collectively, "CHC's Designated Merchant Processor") to provide the Merchant Services.

iii. If provided by CHC and as a precondition to receiving the Merchant Services, Customer must apply to, be approved by, and must enter into an agreement with CHC's Designated Merchant Processor. Applications and agreements are solely between Customer and CHC's Designated Merchant Processor, and CHC does not participate in credit decisions. CHC neither endorses Customer's application to CHC's Designated Merchant Processor, nor does CHC guarantee Customer's acceptance or approval by CHC's Designated Merchant Processor. Customer's failure to qualify for, or loss of, approval by CHC's Designated Merchant Processor will excuse CHC from performance of the Merchant Services under this Solution Order.

## 3. Customer Responsibilities.

3.1 Customer will promptly provide all requested enrollment and demographic information to CHC, to the extent such information is not already administered by CHC, as necessary for integration and onboarding following the Effective Date of this Solution Order, for purposes of CHC providing file testing and data loading. Customer will promptly provide reasonable technical assistance on an as-needed basis during the interface setup and integration process. If Customer experiences any changes, closures, or additions to its merchant processing and banking arrangements that may impact CHC's ability to process payment transactions on behalf of Customer, then Customer will notify CHC at least 30 days prior to any such changes.

3.2 Customer will collaborate with CHC to develop a campaign, to be administered by CHC, using patient statement, directed messaging and other communication vehicles to drive adoption of the selected Services defined herein.

**4.** **Provision of Information.** The Services incorporate the Automated Clearing House ("ACH") processing services of CHC's designated processor of online payments ("ACH Processor"). CHC may require Customer to complete a merchant application form for its designated ACH Processor as a prerequisite to CHC processing payment transactions on behalf of Customer. CHC may change its designated ACH Processor without notice at any time.

**5.** **Responsibility for Payment Amounts and Other Charges.** Customer will be fully liable for the underlying amount of any credit card payments, debit card payments, physical payments, and ACH debit transactions processed by CHC or its Third Parties which are charged back or for which final settlement does not occur. Customer will be fully liable for any fees, adjustments, nonsufficient funds or other charges, fines, assessments, or other penalties imposed upon CHC or its Third Parties with respect to any payment transactions processed on behalf of Customer. CHC and its Third Parties are authorized to offset and to debit via

Peninsula Radiological Associates, Ltd.
Amendment No: P202110042166
December 2, 2020

ACH from a designated Customer account the underlying amount, plus all applicable changes or fees, of any payment transactions processed on behalf of Customer.

Peninsula Radiological Associates, Ltd.
Amendment No: P202110042166
December 2, 2020

**STATEMENT OF WORK**
**COVERAGE DISCOVERY**

The MRA Terms and Conditions and this Service Schedule apply to all services rendered by CHC under this Service Schedule.

1. **Definitions.**
   "Account" means information of a single patient episode of care that is submitted for processing through this service. Multiple inquiry periods for a single patient across multiple claim events or dates of service. Each unique record will constitute a separate Account.

2. **Responsibilities.**

   a. Customer authorizes CHC to process self-pay and other designated accounts containing patient demographic and related data through the Coverage Discovery Service

   b. Customer will assist CHC in obtaining and maintaining appropriate EDI enrollment and unique identifiers (such as tax ID, NPI, or other atypical identifier) to allow for EDI inquiry.

   c. Customer authorizes CHC to update Accounts identified with corrected or supplemental insurance and to submit claims to the appropriate Third Party payers.

   d. Both parties agree to meet monthly to review the performance of the Coverage Discovery service as well as to evaluate key findings and operational observations that may improve performance of the Coverage Discovery Service.

3. **Technical Specifications.** The parties will mutually agree on the specifications and formats required for Account selection and screening criteria. Any deviation from the defined specifications and formats may result in delayed processing by CHC. The information collected by CHC will be extracted and compiled into a mutually agreed upon report format. Requests for formatting modifications to the reports generated by CHC may be subject to additional fees, depending on the nature and scope of the changes required.

**Temporary Funding Assistance Program Agreement**

Last Updated: March 10, 2024

Change Healthcare Operations, LLC may provide you with temporary funding assistance to provide you with funds that you may have otherwise received but for the disruption in processing of electronic healthcare transactions, claims processing and administrative services and payments operations of Change Healthcare  (the "Funding Program").

Should you voluntarily choose to participate in this limited release of the Funding Program, you acknowledge and agree that your participation in the Funding Program is optional and subject to the following terms and conditions of the Funding Program (the "Agreement"), as maybe updated or amended from time-to-time. Throughout this Agreement, the words "Change Healthcare", Change", "CHC", "We", "Us" or "our" means Change Healthcare Operations, LLC its parents, affiliates, successors and assigns and "Recipient", "you" and "your" means the authorized user ("User") or participant in this Program.

By accessing, browsing, or using the Funding Program, you acknowledge that you understand, accept and agree to be bound by this Agreement.

1. **Eligibility to Participate in the Funding Program**. By enrolling to participate in the Funding Program, you agree that eligibility criteria, funding criteria, and the application of the eligibility and funding criteria is made by Us, in our sole discretion, and may be changed or modified. You further agree that enrollment in the Funding Program does not guarantee that you will receive any funds. By accepting the terms of this Agreement, you affirm that if you receive funds under the Funding Program, you understand and agree to the repayment terms and conditions contained herein.

   We may request and you may be required to provide documentation to us which will allow CHC to validate your eligibility to participate in the program and to assist in determining any amount available to you under the Funding Program. Such documentation will be required and deemed acceptable at the sole discretion of CHC. Failure to provide sufficient documentation may result in you failing to be eligible for the Funding Program.

2. **Consent to Share Data.** By agreeing to participate in the Funding Program, you authorize and direct us to share and/or use your data with Optum, Inc. and its parent companies, affiliates, or subsidiaries, as CHC deems necessary, solely to perform services in accordance with this Agreement. You acknowledge and agree that as needed to perform services under this Agreement, CHC, Optum, Inc. and its parent companies, affiliates, and subsidiaries, may access your claims payment data, including your prior claims payments and future claims payments, that are submitted to, processed, adjudicated or otherwise made available through CHC, Optum, Inc. and its parent companies, affiliates, and subsidiaries.

   Recipient authorizes and directs any Person, including Optum, Inc. and its parent companies, affiliates and subsidiaries to release to CHC, as requested, all information, data and documentation related to Recipient, your claims, the administration or servicing of your claims, and claims payments solely for services contemplated in this Agreement. Recipient releases CHC,



Optum, Inc., its parent companies, affiliates, and subsidiaries from any liability associated therewith and agrees to hold harmless all such sources of information, data and documentation provided pursuant to this Agreement.

3. **Funding.** In reliance upon the representations and warranties of Recipient, subject to the terms and conditions of this Agreement, and at the sole discretion of CHC. CHC agrees to disburse to Recipient a sum of money to be determined based on the sole discretion of CHC ("Funding Amount"), for the purposes set forth herein, to be distributed by CHC from its designated bank partner using an electronic funds transfer to the Recipient's bank account registered in Optum Pay.  Recipient agrees that the Funding Amount, if any, will be available for review in the Recipient's Optum Pay account under the Temporary Funding Assistance Program tab. You acknowledge and agree that your decision to accept the Funding Amount is voluntary and can only be disbursed for the full Funding Amount presented to you in the Temporary Funding Assistance Program tab. Such Funding Amount presented to you in the Temporary Funding Assistance Program tab during the enrollment process is hereby incorporated by this reference into this Agreement as the Funding Amount.

4. **Business Purpose.** Recipient agrees that any amounts received under this Agreement are for business purposes only. Recipient will not use any amounts for personal, family, or household purposes and recognizes that funds are only for the purpose of supplementing payments that would otherwise be flowing to provider in the normal course of business. CHC has no obligation to confirm or ensure Recipient's business use of any amount received hereunder and  any personal, family, or household use by Recipient will not affect CHC's right to (1) enforce the Recipient's agreement to repay all funding received under this Agreement, regardless of the purpose for which the funds are in fact obtained; or (2) use any remedy legally available to CHC, even if that remedy would not have been available had the funds been provided to a consumer for consumer or personal purposes or uses.

5. **Repayment.**
    (a) Repayment. Recipient agrees to pay the total Funding Amount disbursed to Recipient in full within thirty (30) business days of receiving notice that the Funding Amount is due ("Repayment Date"). In the event of a failure to repay CHC the full Funding Amount due on the Repayment Date, CHC may seek repayment as outlined in Section 5(b).

    (b) Rights upon Failure to Repay. In the event Recipient fails to pay the total Funding Amount by the Repayment Date, the Recipient acknowledges and agrees that CHC and/or its parents or subsidiaries may: (a) demand immediate repayment of the Funding Amount; (b) debit any past due amounts from the Recipient's bank account used to disburse the Funding Amount; (c) offset the Funding Amount due from any claims or claims payments that are processed or otherwise owed to the Recipient through CHC, Optum Inc., its parent companies, affiliates, or its subsidiaries, and (d) enforce any other rights and remedies available to it under this Agreement in equity or in law. In the event that any amount remains unpaid following all attempts at collections, CHC reserves the right to treat any outstanding amount

2

as a taxable payment to Recipient and to report such amount to the Internal Revenue Service and any State Department of Revenue or Taxation as applicable.

(c) Costs to Enforce Payable by Recipient. Recipient will pay all reasonable costs associated with a breach by Recipient of any of its obligations, covenants or any of the representations and warranties of Recipient under this Agreement and the enforcement thereof. These "reasonable costs" include the costs, including attorneys' fees, associated with defending, protecting, or enforcing the rights under this Agreement including in any bankruptcy proceeding.

6.  **Electronic Funds Transfer.** This Agreement is subject to Article 4A of the Uniform Commercial Code ("UCC"). You hereby authorize us, acting directly or indirectly through a subsidiary, affiliate or third party, to credit or debit your bank account in connection with performing services under this Agreement. You agree that, as applicable, we may rely upon all account information and identifying numbers provided by you on the enrollment documentation to receive Optum Pay Services, as applicable, or as otherwise provided in the enrollment for this Funding Program. We may rely on the routing and account numbers you provided even if they identify a financial institution, person or account other than the one named on the enrollment documentation. You agree to comply with all applicable federal and state laws, regulations, rules and guidelines related to electronic funds transfers, including without limitation, Article 4A of the UCC and the operating rules and regulations of the National Automated Clearinghouse Association. These rules provide, among other things, that payments made to you, are provisional until final settlement is made through a Federal Reserve Bank or payment is otherwise made as provided in Article 4A-403(a) of the UCC.

In the event that we need to debit or credit your Accounts to make adjustments, changes or corrections in accordance with the terms of this Agreement, including to recoup funds for purposes of repayment of the Funding Amount, we may do so immediately and without prior notification. Our right to make adjustments shall include the right to offset amounts you owe us against future amounts payable to you and shall not be subject to any limitations or time constraints, except as required by law.

Recipient shall add Optum Bank ID 1243848778 to its "white list" of acceptable ACH account debits for Recipient's bank account and will not otherwise attempt to block or restrict Optum Bank from debiting your bank account for the amount owed under this Agreement.

7.  **Termination.** This Agreement will automatically terminate once Recipient has paid the total Funding Amount to CHC in accordance with Paragraph 5(a).

8.  **Recipient Representations and Warranties.** Recipient represents and warrants that as of the Agreement Date and until full repayment of the Funding Amount:

(a) Capacity. The officer executing this Agreement is authorized on behalf of Recipient to do so, is at least eighteen (18) years of age and has the legal capacity and all necessary authority to bind Recipient to this Agreement;

3

(b) Approvals and Taxes. Recipient possesses and is in compliance with all permits, licenses, approvals, consents and any other authorizations necessary to conduct its business. Recipient is in compliance with, and the execution of this Agreement and consummation of the transaction contemplated in this Agreement will not conflict with: (i) any and all applicable federal, state and local laws and regulations; (ii) any agreements to which Recipient is a party; and (iii) Recipient's articles or certificate of incorporation, bylaws, or other organizational documents.

(c) Conflicts With Other Agreements. Recipient will comply with the provisions of this Agreement and its performance under this Agreement does not and will not conflict with other agreements to which Recipient is a party or beneficiary, or result in any of the following: (1) violation or default of other agreements; (2) entitlement of any person or entity to receipt of notice or right of consent; (3) a right of termination, cancellation, guaranteed rights or acceleration of any obligation or to loss of a benefit; or (4) creation of any claim on the properties or assets of Recipient;

(d) Authorization. Recipient has the power and authority to enter into and perform Recipient's duties and obligations under this Agreement and any documents required to facilitate the transactions contemplated by this Agreement. Recipient is not a party to any contract or aware of any existing situation that would prevent Recipient from entering into or performing its obligations under this Agreement. Recipient has taken all necessary action to authorize its respective execution and delivery of, and performance under, this Agreement;

(e) Other Proceedings and Bankruptcy. Recipient has not declared bankruptcy within the past seven years and is not currently contemplating the filing of a bankruptcy proceeding or closing or materially modifying Recipient's business. Recipient is solvent and financially capable of fulfilling its obligations under this Agreement;

(f) Good Standing. Recipient is validly existing and in good standing under any applicable laws of its state of organization. Recipient has all requisite power and authority to own, lease, pledge and operate its properties and assets and to carry on its business as presently conducted;

(g) Compliance With Laws. Recipient is in compliance with all statutes, rules, regulations, orders or restrictions of all applicable Governmental Authorities.

9. **Consent to Electronic Payment and Communications.** You hereby consent to receive all communications, including statements and notifications related to payment electronically through our Internet website. Any written notice required or permitted to be given to you pursuant to this Agreement may be provided to you at the email address provided by you to us during the enrollment process. Any notice required or permitted to be given to us pursuant hereto shall be provided in writing to the following address: Change HealthCare Operations, LLC, c/o Optum Financial, Inc., P.O. Box 30777, Salt Lake City, UT 84130-0777. Written notices sent by mail shall be delivered by registered or certified mail, return receipt requested, postage prepaid and shall be deemed effective seventy-two (72) hours after the same is postmarked. Notice sent by any other method shall be effective only upon actual receipt.

10. **Governing Law.** The laws of the State of Minnesota shall govern this Agreement and all disputes arising hereunder or thereunder. You agree that jurisdiction and venue are proper in the State of Minnesota for the resolution of any dispute arising under this Agreement.

11. **Changes to the Agreement.** We may add, remove, change or otherwise modify any term of this Agreement at any time by providing you with notice. You agree that amendments may be provided in electronic form and will be sent to your primary user's email address. We may also modify, terminate or discontinue some or all of the Funding Program services at any time and will provide notice of such changes only as required by applicable law.

12. **Severability.** If any provision of this Agreement is found to be unenforceable according to its terms, all remaining provisions will continue in full force and effect.

13. **Assignment.** Recipient may not assign or transfer its rights or obligations under this Agreement, but rights of CHC, and/or its parents, affiliates, successors and assigns may be assigned without restriction.

14. **Complete Agreement.** This Agreement constitutes the entire Agreement between the parties related to this subject matter and supersedes any prior agreements or understandings between the parties.



RECEIVED
FEB 1 8 2025
HENRICO CIRCUIT COURT